IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | |
|---|---|
| Plaintiff, | CR14-02097-TUC-JAS(JR) |
| vs. | **REPORT AND RECOMMENDATION** |
| Carlos Cantizano, | |
| Defendant. | |

On March 13, 2017, Defendant filed a Motion to Suppress Statements. Doc. 68. The Government filed a response on April 10, 2017. Doc. 75. The matter was heard by Magistrate Judge Rateau on April 20, 2017. Doc. 78. Defendant was present, represented by counsel and testified. *Id.* The Government presented two witnesses. Doc. 80. Five Government exhibits were admitted. Doc. 81. Three defense exhibits were admitted. Doc. 79. Having considered the matter, the Magistrate Judge submits the following Findings of Fact and Conclusions of Law and recommends that Defendant's Motion to Suppress Statements be granted.[1]

---

[1] Trial is currently scheduled for May 16, 2017, a pretrial conference is set for May 10, 2017, and a plea deadline has been set for April 28, 2017. Doc. 66.

## I. FINDINGS OF FACT

Special Agent ("SA") Louis Hollis and SA Greg Kelly are criminal investigators with Homeland Security Investigations. Tr. 4, 64. Their duties include, and they have special training in, the investigation of child exploitation cases. Tr. 6, 65. In 2012, while working from Nogales, Arizona, SA Hollis connected online downloads of suspected child exploitation files to an IP address assigned to a residence located at 1134 East Mount Shibelle Road in Sahuarita, Arizona. Tr. 7, 9. SA Hollis contacted SA Kelly, who was stationed in Douglas, Arizona at the time, to assist with the investigation. Tr. 65-66.

Prompted by the online information, SA Hollis and other agents conducted surveillance of the residence and saw two different vehicles, a truck and a white van, parked at the residence, however, the agents had not associated the downloads with a specific person. Tr. 7, 9. Based on the information the agents collected, SA Hollis sought and obtained a search warrant for the residence. Tr. 7, Def. Ex. 3 (search warrant).

The warrant was executed on August 3, 2012. Tr. 8. While gathered with other agents at a nearby staging area, SA Hollis and SA Kelly recall that the agents or officers surveilling the house reported that the white van was leaving the residence. Tr. 49-50, 67-68. Either SA Hollis or group supervisor Ricardo Perez directed the agents or officers at the house to stop the van and escort the occupants back to the residence so the agents "didn't have to break the house down basically to get inside." Tr. 9-10, 16, 51-52, 68. Radio records reflect that the van left the residence at 10:24 a.m. and was stopped at

10:26 a.m. at the intersection of Mount Shibelle Road and Indian Tank Road, which SA Hollis described as being "a couple of blocks from the house." Tr. 13-15, 17, 93; Gov. Ex. 5 (radio log[2]); Def. Ex. 1 (map of location).

The only testimony about the particulars of the stop came from Defendant Cantizano. He testified that he was staying at the Mount Shibelle residence while visiting his nephew, David Banda. Tr. 85-86. Cantizano recalls that sometime in the morning he, his sister Joanna, who was visiting from West Virginia, and Mr. Banda left the residence in Cantizano's white van intending to travel to Home Depot for some building supplies. Tr. 86-87, 110. After Cantizano drove away from the residence, he was approaching a stop sign when "a blur comes up, and then a crazy white guy jumps out with a gun . . . ." Tr. 87-88, 129-130. The "blur" was a tall, dark, SUV-type vehicle without lights or sirens that approached Cantizano's van at an angle blocking him from going forward. Tr. 87-88, 92, 113. Cantizano's initial instinct was to tell his sister to "get down and call 911, and hit the gas." Tr. 88. However, something caught his attention that made him "think this guy might be a cop." Tr. 88, 91, 114. The "crazy white guy" started walking toward the van while pointing his gun at Cantizano's head. Tr. 89, 112. Because his windows were rolled up and the air conditioning was on, Cantizano could not hear what he was saying. Tr. 89-90, 132. Once Cantizano realized it was a police officer, he put the car in park, raised his hands, got out of the car, was told to turn around and put his hands behind his back and then was handcuffed. Tr. 90, 116, 131. Cantizano was

---

[2] The time stamps in the radio log are Eastern Standard Time and are three hours later than Arizona time on August 3, 2012. Tr. 41.

unaware of what was happening with the other occupants of the van. Tr. 90. After he was handcuffed, Cantizano asked what prompted the stop and the officer told him that he was going back to the house and then they could talk about it. Tr. 117. As he was placed in the back of a sedan-type vehicle, Cantizano told the officer that he had left the van running and it was low on gas. Tr. 91, 130. The officer told him that the van would be driven back to the house. Tr. 91.

SA Hollis was not involved in the stop of the van, but recalls driving by the van, which was stopped on the side of the road, on the way to the residence. Tr. 16-17. When SA Hollis arrived at the house, there were "a half-dozen Nogales HSI agents" along with other border patrol agents and local law enforcement officers on the scene. Tr. 20, 48, 59-60. SA Hollis knocked on the door and there was no answer. Tr. 20. Shortly thereafter, the occupants of the van arrived by transport and SA Hollis spoke with David Banda, the homeowner, and explained why they were there. Tr. 20-21. Mr. Banda told SA Hollis that there were two minors inside the house and opened the front door and was allowed to remove the minors from the house. Tr. 18, 21-22. SA Hollis recalls that Mr. Banda, his mother, and Defendant Cantizano were then "just milling around" in front of the garage area of the residence. Tr. 23-24; Gov. Ex. 2 (photograph of front of residence). He recalls that none of the individuals were handcuffed. Tr. 24.

SA Kelly, who was with his partner SA Nuckles, did not know the area well and "just kind of hung back waiting for the go-ahead to approach the residence." Tr. 68. When he arrived at the house, "there were a lot of cars on scene," and he recalls that the white van was parked in the cul-de-sac and the three residents of the home were not

handcuffed and were "milling about" by the garage. Tr. 69.

After the agents secured the house, SA Hollis told Mr. Banda that he was not under arrest and was free to go, but that the agents would like to talk to him. Tr. 25. Beginning at about 10:45 a.m., the agents spoke with Mr. Banda for approximately 10 minutes and SA Hollis eventually told Mr. Banda, who he described as "shocked and confused," that they had a search warrant associated with a child pornography investigation. Tr. 25-26, 37.

After completing their discussion with Mr. Banda, SA Hollis consulted with SA Kelly about their "game plan" and they decided to talk next with Defendant Cantizano. Tr. 26-27, 70. SA Hollis recalls that Cantizano was not handcuffed, but was standing in the area of the garage and "looked a little nervous." Tr. 27, 72. The interview began at about 10:58 a.m. with the agents telling Cantizano he was not under arrest and was free to go, but that they were hoping he could help them out. Tr. 28, 35, 38, 71. Cantizano agreed to talk and Agents Hollis and Kelly walked him to a shady area under a neighbor's tree to avoid the heat. Tr. 29-30, 73-74.[3] When the agents asked him what they would find on his computer, Cantizano told them that they were not allowed to look at his computer because he did not live at the residence. Tr. 32. Cantizano also told them that "no one else has used my computer ever." Tr. 63, 78; Gov. Ex. 4 (SA Hollis's notes). When asked questions about child exploitation, Cantizano "got distant" and "would just get quiet for a minute or two" and give one word answers. Tr. 35, 54-55, 76. He also

---

[3] SA Hollis recalls that SA Kelly asked most of the questions. Tr. 55-56.

refused to give the agents the password to his computer. Tr. 78. After about 10 or 15 minutes of questioning, Cantizano stopped answering questions and the interview ended. Tr. 35-36, 78. SA Hollis then gave Cantizano his phone number and the scene was cleared at approximately 12:42 p.m. Tr. 57-58, 59.

Cantizano's recollection of events at the house differs from that of the agents. Cantizano recalls that he was taken back to the house while still handcuffed behind his back and was removed from the officer's vehicle and taken to the front of the garage. Tr. 93-94, 96. He does not recall which officer it was, but he was then told that they were going to pat him down to insure he did not have a weapon. Tr. 94-95, 120. Cantizano had a "military flip knife" that he used for work in his front pocket and the officers took it from him. Tr. 94. Officers also asked him about his metal belt buckle and he told them that he worked in metal design and had made the buckle himself. Tr. 95. The officers examined it, flipping it over, Cantizano believed, to see if there were any weapons behind the buckle. Tr. 95-96.

Cantizano indicated that while he was in front of the garage he sat down on the bumper of a car. Tr. 122. He kept asking, but officer would not tell him what was happening. Tr. 123, 125-126. He also recalled, at some point, feeling sick to his stomach because of something SA Hollis said, and asking for and getting permission to sit on a nearby boulder. Tr. 98. After being in front of the house for about 10 minutes, the handcuffs were removed and he was moved to under the neighbor's tree. Tr. 95, 97, 150. As the handcuffs were being removed, Cantizano recalls the officer asking, "You're not going to run, are you?" Tr. 97, 150.

When the interview commenced, he was not given his *Miranda* warnings and was not told that he was free to leave. Tr. 97, 99. He recalls that during the interview, SA Hollis would come and go from under the tree while asking questions. Tr. 98-99. The agents asked if he owned a computer and Cantizano told them that he did and described it for them. Tr. 137. SA Hollis asked him for the password and Cantizano refused to provide it. Tr. 137-138. At first, he answered the agent's questions voluntarily, but eventually told them that he did not want to talk anymore and began ignoring the questions and this prompted one of the agents to snap his fingers in front of Cantizano's face. Tr. 99-100. The agents persisted in asking questions, which Cantizano ignored, until one of the agents stated, "as far as I know, it's your nephew that's been using the computer, and I'm going to have to take him in . . . ." Tr. 100-101. Cantizano understood this as a threat that the agents were going to arrest his nephew and "blurted out, no, my nephew doesn't use the computer." Tr. 100-102, 145-146. At that point, Cantizano began responding to the agent's questions by saying, "I don't want to talk to you anymore," and telling the agents that he did not trust them. Tr. 102-103. He believed the agents were lying to him about finding pornography on his computer and in relation to the threat to arrest his nephew. Tr. 103. After Cantizano stopped answering questions about the investigation, the agents asked him for his social security number, about his residency, and discussed travel to Mexico. Tr. 105-106. Toward the end of the interview, Cantizano asked if he was under arrest and was told he was not. Tr. 124. Cantizano also asked the agents if he was permitted to return to his home in California, and after not getting a direct response, stayed for several more days because he was afraid

to go home. Tr. 106-107. Cantizano recalls that the interview lasted longer than 15 minutes. Tr. 147.

## II. CONCLUSIONS OF LAW

Cantizano contends that the stop of his van on August 3, 2012 was without justification and that his subsequent detention was unlawful. He further argues that the statements he made while detained were the product of his unlawful detention and should be suppressed. The Government contends the reason for the stop, to obtain the homeowner's assistance for entry, was valid and reasonable. The Government further contends that that even if the initial stop and detention was illegal, substantial intervening events removed the illegal taint of the initial stop and detention.

In *Michigan v. Summers*, 452 U.S. 692, 705 (1981), the United States Supreme Court held that officers executing a search warrant have the authority to detain the occupants of a house while a proper search is conducted. Such a detention is lawful because the character of the additional intrusion caused by a detention is slight and the justification for detention is substantial. *Id.* at 701–705. The Court noted that the detention of an occupant is "surely less intrusive than the search itself," and the presence of a warrant assures that a neutral magistrate has determined that probable cause exists to search the home. *Id*. at 701.

Here, the issue is whether the reasoning in *Summers* can justify a detention beyond the premises being searched. The Supreme Court in *Bailey v. United States*, 133 S.Ct. 1031 (2013), clarified the limits of the *Summers* doctrine. In *Bailey*, while police were preparing to execute a search warrant, detectives were conducting surveillance in an

- 8 -

unmarked car outside of the apartment. The detectives saw Bailey leave the apartment, get in a car and drive away. They followed the car approximately a mile before stopping it. Bailey was handcuffed and driven in a patrol car to the apartment where police executed the search warrant and found drugs and a weapon. Bailey was later convicted of possession of a firearm by a convicted felon and possession of drugs. In reversing Bailey's conviction, the Court stated:

> As recognized in *Summers*, the detention of a current occupant "represents only an incremental intrusion on personal liberty when the search of a home has been authorized by a valid warrant," [citations omitted] but an arrest of an individual away from his home involves an additional level of intrusiveness. A public detention, even merely incident to a search, will resemble a full-fledged arrest and can involve the indignity of a compelled transfer back to the premises.

*Bailey*, 133 S.Ct. at 1035. Thus, the Court held that detention incident to the execution of a search warrant is limited to "the immediate vicinity of the premises to be searched." *Id*. at 1042. To define what constitutes the immediate vicinity, the Court directed trial courts to examine whether the defendant was detained within "the lawful limits of the premises, whether the occupant was within the line of sight of his dwelling, the ease of reentry from the occupant's location, and other relevant factors." *Id*. Any detention outside the immediate vicinity is not justified by the law enforcement interests identified in *Summers* as "minimizing the risk of harm to the officers," the "orderly completion of the search," and "the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found." *Id*. (citing *Summers*, 452 U.S. at 702-03).

As a threshold matter, there is no dispute that Cantizano was outside the lawful limits of the search premises when he was detained. Also, the Government does not

contend that he was within the line of sight of the premises or that he could have easily reentered the premises. Like the defendant in *Bailey*, Cantizano was driving away from the residence that was the subject of the search warrant and was two blocks away at the time of the stop. Thus, the stop took place "at a point beyond any reasonable understanding of the immediate vicinity of the premises in question." *Bailey*, 133 S.Ct. at 1042.

Additionally, as described by Cantizano, the stop actually increased the risk of harm to officers because Cantizano saw only a "crazy white guy with a gun" and considered attempting to evade the officer by driving away. *See Summers*, 452 U.S. at 702 (detention warranted based on risk of "sudden violence"). The agents' testimony also did not establish that Cantizano's detention rendered the search more orderly. They described an orderly search that was largely unaffected by Cantizano's presence. Finally, the Government has not established the presence of any legitimate interest in preventing flight. At the time, the agents knew only that the incriminating activity described in the warrant originated from the residence, but had not connected the activity to a specific individual. The stop of the van was more of a fishing expedition than flight prevention. During that execution of a search warrant, *Bailey* limits detention "to those who are present when and where the search is being conducted." 133 S.Ct. at 1062. Cantizano was not present when and where the search warrant was executed and, therefore, the stop of the van and Cantizano's detention were unlawful.

The next question is whether Defendant's initial illegal detention warrants the suppression of the statements he later gave when he was taken back to the house.

According to the Government, even if the original stop and detention of the Defendant was illegal, significant intervening events erased the illegal taint and rendered the subsequent statements voluntary.

It is clear that incriminating statements obtained by exploitation of an illegal arrest may not be used against a criminal defendant. *Brown v. Illinois*, 422 U.S. 590, 603 (1975); *Wong Sun v. United States*, 371 U.S. 471, 484–86 (1963). In evaluating the admissibility of a defendant's statement made after an illegal arrest, the government bears the burden of establishing significant attenuation between the Fourth Amendment violation and the defendant's statement and demonstrate that the statement was "'sufficiently an act of free will to purge the primary taint.'" *Brown*, 422 U.S. at 602, (quoting *Wong Sun*, 371 U.S. at 486). Whether there was a "break" in the causal chain between an unlawful arrest and a defendant's incriminating statement depends on the facts of each specific case. *Id*. In analyzing the admissibility of such a statement, a court must consider several factors, including: (1) the "purpose and flagrancy of the official misconduct"; (2) whether *Miranda* warnings were given to the defendant; (3) the "temporal proximity of the arrest and the confession"; and (4) the presence of intervening circumstances. *Brown*, 422 U.S. at 603–04.

The Supreme Court found such attenuation in *Wong Sun*, a case where the defendant was arrested without probable cause and released on his own recognizance but then, days later, confessed to certain crimes. 371 U.S. at 491. Under those circumstances, the Supreme Court concluded that suppression of the confession was not warranted because "the connection between the arrest and the statement had become so

attenuated as to dissipate the [Fourth Amendment] taint." *Id*.

In this case, however, the factors do not establish any significant attenuation between Cantizano's seizure and his statement. The felony stop with a drawn weapon was not only illegal under *Summers* and *Bailey*, but also objectively excessive given that officers had no reason to believe that the occupants of the van were dangerous. In making the stop, the officer employed the sort of restraint that a reasonable person would "normally associate[] with formal arrest. *See United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004). Cantizano's uncontradicted testimony describing the initial stop, detention and transport back to the house establishes that the very nature of the detention was inherently coercive.

*Miranda* warnings may also be evidence of attenuation. *Brown*, 422 U.S. at 602. Here, the Court observes that neither the officers who stopped and detained Cantizano two blocks from the house nor the agents who questioned him at the house, provided any *Miranda* warnings. While the Government argues that Cantizano showed that he was capable of telling the agents he did not want to answer any more questions, by that time he had already provided incriminating information that he might not have otherwise provided if he had been provided his *Miranda* warnings.

The "temporal proximity" factor is also unfavorable to the Government. The agents' testimony established that Cantizano's van was stopped at 10:26 a.m. and that their questioning of Cantizano commenced at about 10:58 a.m. During the intervening 32 minutes, Cantizano remained in the driveway of the residence, possibly in handcuffs, but certainly under the watch of law enforcement. He watched as agents and officers

searched the house and questioned his nephew. Thus, the only intervening event of any potentially serious significance was that the agents purportedly told him before they commenced questioning that he was free to leave. That factor, however, does not outweigh the fact that he was detained at gunpoint, handcuffed, transported back to the residence, and watched by law enforcement for the 32 minutes between the stop and the commencement of questioning. Therefore, the causal connection between the illegal stop and detention and the incriminating statement remained unbroken.

Taken together, the factors set forth in *Brown* support the suppression of the statement made by Cantizano after his detention on August 3, 2012. The Government's characterization of the stop and detention as one designed solely to prevent the necessity of breaking into the residence is undermined by the nature and aggressiveness of the initial stop and by the fact that they capitalized on the illegal detention by aggressively questioning Cantizano about his computer, including determining ownership and attempting to obtain his password. The evidence suggests that the stop and detention were used as an impermissible means of uprooting evidence. *See Dunaway v. New York*, 442 U.S. 200, 218 (1979) (confession given by defendant after he was seized in violation of Fourth Amendment was inadmissible where no intervening event broke the connection between illegal detention and confession). Thus, the Government has not met its burden of establishing that Cantizano's statements were "sufficiently an act of free will to purge the primary taint."

### III. RECOMMENDATION FOR DISPOSITION BY THE DISTRICT JUDGE

Based on the foregoing, the Magistrate Judge recommends that the District Court,

after an independent review of the record, **GRANT** Defendant's Motion to Suppress Statements (Doc. 68).

This Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment. However, the parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the District Court. *See* 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure. Thereafter, the parties have fourteen (14) days within which to file a response to the objections. No replies are permitted without leave of court. If any objections are filed, this action should be designated case number: **CR 14-2097-TUC-JAS**. Failure to timely file objections to any factual or legal determination of the Magistrate Judge may be considered a waiver of a party's right to de novo consideration of the issues. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

Dated this 2nd day of May, 2017.

                                        Honorable Jacqueline M. Rateau
                                        United States Magistrate Judge